DE MARY *v.* BURTENSHAW'S ESTATE. [1]

1. WITNESSES — MATTERS WITHIN KNOWLEDGE OF DECEDENT — AGENT OF PARTNERSHIP.

   3 Comp. Laws, § 10212, disqualifying an agent of a corporation, in a suit between it and the representatives of a deceased person, from testifying to matters equally within the knowledge of the deceased, does not extend to an agent of a partnership. [2]

2. STATUTE OF FRAUDS—BROKERS—ORDER TO BUY.

   An order to a broker to buy wheat, reduced to writing and signed in the name of the customer, and in his presence, by the broker's agent, and acted upon by the broker, is not within the statute of frauds.

3. BROKERS—MARGINS—ADVANCES.

   Where a contract with a broker for the purchase of wheat for future delivery gave him the right to close out the transaction in case margins were not kept good, and the customer died while behind in his margins, and his personal representatives refused to take any action, the broker was not bound to make advances to carry the wheat, but was justified in closing out the deal.

4. SAME—GAMBLING TRANSACTIONS—QUESTION FOR JURY.

   Whether a contract with a broker for the purchase of wheat on

[1] Rehearing denied January 5, 1903.
[2] This statute was amended by Act No. 30, Pub. Acts 1903, so as to exclude generally the testimony of those acting as agents in making or continuing contracts with decedents.

margins for future delivery was a *bona fide* transaction, or
was a mere gambling contract, prohibited by 3 Comp. Laws,
§ 11373, was properly submitted to the jury, though it appeared
that the buyer had no personal use for the wheat, and that
the broker had never delivered any wheat under such con-
tracts during the many years he had been in business.

Error to Wayne; Lillibridge, J. Submitted October
11, 1901. (Docket No. 46.) Decided September 17, 1902.

Andrew J. De Mary, John R. Heintz, and Richard D.
Lyman, copartners as De Mary, Heintz & Lyman, pre-
sented a claim against the estate of James Burtenshaw,
deceased, for a balance due on account of the purchase
and sale of certain wheat. The claim was disallowed by
the commissioners, and claimants appealed to the circuit
court. From a judgment for claimants, defendant brings
error. Affirmed.

*Russel & Campbell*, for appellant.

*Philip T. Van Zile*, for appellees.

MOORE, J. The claimants presented a claim against
the estate of Mr. Burtenshaw of $1,475. This was disal-
lowed by the commissioners on claims. An appeal was
taken to the circuit court, where the case was tried by a
jury, who rendered a verdict for the full amount claimed.
The case is brought here by writ of error.

The claimants are partners, residing in Buffalo. They
buy and sell stocks, bonds, grains, provisions, and other
things. Their main office is in Buffalo. For some years
they have had a branch office in Detroit, in charge of Mr.
MacMahon, who was employed by them upon a weekly sal-
ary, and who had no other pecuniary interest in the business.
Mr. Burtenshaw, during the fall of 1895, began to place
with these brokers orders to buy and sell grain and other
commodities, which orders were from time to time exe-
cuted, and commissions were charged, and paid by him.
On June 1, 1898, Mr. Burtenshaw requested Mr. Mac-

Mahon to buy 10,000 bushels of September wheat. Mr.
MacMahon at once filled out and signed in the presence of
Mr. Burtenshaw the following :

"On all marginal business the right is reserved to close transactions when margins are running out, without giving further notice, and to settle contracts in accordance with the rules and customs of the Chicago Board of Trade and New York Stock Exchange."

"All transactions made by us for your account contemplate the actual receipt and delivery of the property and payment therefor.

"DETROIT, June 1, 1898.

"DE MARY, HEINTZ & LYMAN: Buy for my account
and risk, 10 Sept. wheat, 78¾ @ 79.

[Signed]   "BURTENSHAW.

"All orders expire each day, unless made open when
given."

On June 4th a like order for 25,000 bushels was given,
and on June 6th one for 10,000 bushels. It was the claim
of claimants that these orders were at once filled, and Mr.
Burtenshaw notified. On the morning of June 7th, Mr.
Burtenshaw suddenly died. He had a small balance to
his credit on the books of the claimants, but had not made
any advancements on these purchases. On June 7th,
Mr. C. and Mr. S., representing the family of Mr. Burtenshaw, came to the office in Detroit, and notified Mr. Mac-
Mahon of the death of Mr. Burtenshaw. They were told
of the transactions between Mr. Burtenshaw and claimants,
and declined to accept any responsibility in connection
therewith. As no margin had been put up by Mr. Bur-
tenshaw, the claimants sold the September wheat. The
transaction resulted in a loss. They were charged by
their broker at Chicago with the amount of the loss, and
it is to recover this amount and the commissions that this
claim is presented.

Mr. MacMahon was allowed to testify fully as to the
transaction. It is said, if a proper construction had been
given to section 10212, 3 Comp. Laws, this testimony
would have been excluded, as being equally within the
knowledge of Mr. Burtenshaw. Mr. MacMahon had no

pecuniary interest in the result of this litigation. It is conceded that this testimony does not come directly within the wording of the statute, but it is said there is the same reason for holding the agent of a partnership disqualified from testifying that there is in holding the agent of a corporation. This is an argument which should be directed to the legislative, rather than to the judicial, department of government. It was for the legislature to say who might and who might not testify. The inhibition has been put upon agents of corporations, and has not been put upon agents of partnerships. We cannot, by construction, put into the statute what the legislature have not seen fit to put into it. See *Howard* v. *Patrick*, 43 Mich. 121 (5 N. W. 84), and the cases there cited; *Webster* v. *Sibley*, 72 Mich. 630 (40 N. W. 772).

It is claimed that, as the order exceeded in value the sum of $50, the contract should have been evidenced by a writing signed by the deceased; citing 3 Comp. Laws, § 9516. If the transaction was as testified to by Mr. Mac-Mahon, the transaction was not prohibited by the statute.

It is also urged that claimants had no right to sell the wheat as they did, but should have carried it until September, and then, if there was a loss, should have presented a claim against the estate. The record shows that Mr. Burtenshaw was entirely familiar with the method of doing business. The contract provided that the transaction might be closed if the margins were not kept good. The record shows that the margins were not kept good, and that wheat had fallen in price. This was the situation when Mr. Burtenshaw died, and his representatives declined to take any action in the matter. Under such circumstances the claimants were not bound to make all necessary advances to carry the wheat until September, but might close the deal as provided in the order.

Error is assigned upon the exclusion of testimony, but, as all the facts were ultimately allowed to go before the jury, we do not deem it necessary to discuss that assignment.

Upon the part of the defense it is insisted that this was nothing more nor less than an option to buy or sell at a future time, and is a gambling contract, pure and simple, and is prohibited by section 11373, 3 Comp. Laws. Upon the part of the claimants it is insisted that the contract was for the purchase of grain to be delivered in the future, and not within the prohibition of the statute. The defendant presented the following requests to charge:

"1. If you find that it was not the intention of the parties in this suit that the contract should be carried through, and that there should be an actual delivery of the wheat sought to be recovered on, then the contract was illegal and void, and you should find in favor of the defendant.

"2. In arriving at a conclusion in regard to the intent of the parties, other similar transactions between the parties, which had been closed out prior to the making of this contract, should be taken into consideration by you.

"3. The fact that no wheat has ever been delivered under any contract ever made in the Detroit office of De Mary, Heintz & Lyman should be considered by you in determining the intention of the parties.

"4. Dealing in 'puts' or 'privileges,' so called, is illegal; so that, if you believe that the purchases of wheat were ordered to be made in consequence of 'puts' which had been sold by Burtenshaw, then the entire contract between the parties is void, on account of its being so tainted with illegality."

The first three of these requests were given. The last one was refused, except as covered in the general charge, which contained, among other statements, the following:

"The second defense is that the deals between claimants and Burtenshaw were not transactions in which delivery of wheat was contemplated by either party, but that they were purely speculative, and did not contemplate the delivery of any wheat. It is necessary for you to understand clearly the difference between the purchase of commodities for delivery, and pretended purchase of commodities when no delivery is intended by either party. The law is clear that dealing in futures is legal and proper, and, if we could know the course of dealings of the wholesale houses of this city, we would probably find the fact to be that wholesale dealers give their orders six months in

advance of the time they expect the goods. In other words, they purchase their goods months in advance of the time that they are to be delivered. So there is nothing illegal in the purchase of goods which are not in actual existence, for future delivery. Neither is there anything unlawful in the purchase of grain, or any other commodity, upon what is called a 'margin.' The margin is simply part of the purchase price paid when the order is given, and the balance to be paid when the goods are delivered, or at some other time. What the law does object to is fictitious sales,—when there is no contemplation by either side that the commodities are to be delivered. Now, I hope I have made that clear to you, gentlemen, and if you will understand the agreement for the purchase of commodities to be delivered in the future is perfectly lawful, but that, on the other side, an agreement for a fictitious or pretended delivery of commodities, where the parties intend to settle according to the rise or fall of the commodity before its delivery, and where there is no contemplation or intention on the part of either side that the actual commodity shall be delivered, that is what the law objects to and prohibits. In this connection I will call your attention to the statute which has been read in evidence before you. It is section 9354*f*, 3 How. Stat. [Reads statute.] You will see, gentlemen, that statute aims at what is considered the sale of pretended commodities without any intention to deliver them, or the purchase of pretended commodities without the intention to receive them. That is the transaction which the law forbids.

\* \* \*

"Now, the question is, What did either of the parties contemplate to this transaction? It is not enough that one of them did not contemplate the delivery of the wheat; it is not enough that you may think that Burtenshaw did not intend this grain to be delivered; it is not enough that you assume that he was speculating. You must also believe that the claimants also did not contemplate the delivery of the wheat, and upon that branch of the case the burden of proof is upon the defendant. That is to say, if you believe that these orders were given to buy the wheat, as claimant has testified, then it was a transaction which, upon its face, was regular, and it was legal,—a legal, *prima facie* transaction; and the law places the burden upon *any* man who attempts to claim differently, the burden to prove it. If the defendant claims that the

contract was not what it appears to be, the law says upon him shall be the burden to prove or point out that it was unlawful; so that upon that branch of the case the burden of proof is upon the defendant.  I will afterwards define to you what is the burden of proof.

"Now, gentlemen, another defense in this case is that this wheat, even if bought, was purchased to protect or offset certain 'puts' he had sold prior to the dates of these purchases; that they were bought to protect himself against these puts.  Now, gentlemen, we are getting into technical language here.  What is called a 'put' has been explained to you fully here.  It seems to be this:  That a person may sell a right to some one else for a consideration,—the right to some one else to bring to him the following day a certain quantity of grain at a certain price, and he is obliged to take it, or settle for the rise in the wheat of the difference between that value paid and wheat on that day.  Now, it is conceded here that this dealing in 'puts' and 'privileges,' as they have been called, is what would be called wagering or unlawful transactions. It is claimed here on the part of the defendant that Mr. Burtenshaw had, prior to the 5th and 6th, sold certain 'puts,' which were due to be fulfilled by him on these days.  It is claimed, also, that these 'puts' or 'privileges' were tendered to him on these days, and he was obliged to take the wheat on the terms which he had made to take it on these days, and it is claimed these 'puts' had been placed upon Burtenshaw by the claimants in this case, De Mary, Heintz & Lyman; whether for themselves or for others, I don't know.  Now, the claim is that these orders which are in controversy in this case were given and the wheat was purchased—if it was purchased—to protect Burtenshaw against these 'puts;' and the contention is that, since the 'puts' were confessedly unlawful, these purchases of wheat under these orders, which were made to protect Burtenshaw against these 'puts,' were tainted with the same illegality, and that the plaintiffs cannot recover.  Upon that point, gentlemen of the jury, I think I have stated to you the. defendant's claim.  The claimants' claim is that they have no knowledge what was in Burtenshaw's mind; that he came to them, and gave them orders to purchase certain quantities of wheat, and they did not know what his intentions were as to the purchase; that that was his concern; and that De Mary, Heintz & Lyman knew nothing about what he was going to do with

his purchase of wheat, but that they purchased the wheat in good faith upon his order, not knowing anything about his purposes in buying or ordering the wheat, and if he did, as a matter of fact, give these orders for the purpose of protecting himself against 'puts' which he had sold, they had no knowledge of it; that they bought the wheat in the regular course of their business.   Now, what I have to say to you upon that is, if these orders were given by Burtenshaw to protect himself against 'puts' or 'privileges,' it would be an unlawful transaction; otherwise it would not.   Now, I think that is all I care to say to you about that."

It will be seen that the question of fact was fully submitted to the jury.   If that question were for us to decide, we might be greatly influenced by the fact that Mr. Burtenshaw had no use personally for wheat, that he was not grinding it, and that actually none' was delivered to him, and that, during the many years claimants were doing business in Detroit as brokers, they did not actually deliver to the persons who had ordered through them any wheat, and have reached the conclusion that the transaction was a gambling one, and prohibited by the statute; but we do not pass upon the facts.   This is the province of the jury, under proper instructions from the court.   The circuit judge stated the rule of law substantially as it has been announced in *Gregory* v. *Wendell,* 39 Mich. 337 (33 Am. Rep. 390); *Id.,* 40 Mich. 432; *Carland* v. *Telegraph Co.,* 118 Mich. 369 (76 N. W. 762, 43 L. R. A. 280, 74 Am. St. Rep. 394); *Donovan* v. *Daiber,* 124 Mich. 49 (82 N. W. 848); *Sampson* v. *Cotton Mills,* 82 Fed. 833, 836; *Bibb* v. *Allen,* 149 U. S. 481, 495 (13 Sup. Ct. 950); *Roundtree* v. *Smith,* 108 U. S. 269 (2 Sup. Ct. 630).

The other assignments of error have been considered, but we do not deem it necessary to discuss them.   The case was very ably and carefully tried.   The jury accepted the version of claimants, and we do not feel at liberty to disturb their verdict.

Judgment is affirmed.

HOOKER, C. J., and MONTGOMERY, J., concurred. GRANT, J., did not sit.