GRAND RAPIDS TERMINAL BELT RAILWAY CO. *v.* WATERS.

SAME *v.* PERE MARQUETTE RAILROAD CO.

1. RAILROADS—TRACKS—SIDETRACKS.

Railroad companies are not required to build or maintain tracks to private industries, nor to furnish the right of way or rails by which the traffic of a private industry reaches their lines.

2. SAME—IMPLIED CONTRACTS—USE OF TRACKS.

Where the president of a cement company constructs a belt line railroad for transfer purposes which is intended for the use of the company and other industries that may be located and organizes a corporation to take over the railroad and owns all the stock therein, except qualifying shares, and cars are transferred to and from such plant only by engines of connecting railroads, there is no implied contract by the railroads to pay for the use of the line, demands for payment being met with refusal or with conduct tantamount thereto.

Error to Kent; Lamb, J., presiding. Submitted June 25, 1917. (Docket Nos. 72, 73.) Decided September 27, 1917.

Assumpsit by the Grand Rapids Terminal Belt Railway Company against Dudley E. Waters and another, receivers of the Pere Marquette Railroad Company, and against the Pere Marquette Railroad Company for trackage service. By stipulation the cases were tried as one. Judgment for defendants. Plaintiff brings error. Affirmed.

*Kleinhans, Knappen & Uhl,* for appellant.

*John C. Bills (Norris, McPherson, Harrington & Waer* and *Seward L. Merriam,* of counsel), for appellees.

BROOKE, J. The issue in these two cases was tried by the court without a jury, who made the following findings of fact and conclusions of law:

## "Findings of Fact.

"The plaintiff is a Michigan corporation, having been organized under and by virtue of our laws in the month of December, 1905. The defendant, the Pere Marquette Railroad Company, is a corporation, and a recognized common carrier in both intra and interstate commerce.

"Early in the year 1905, the Acme Cement Plaster Company completed its Grand Rapids plant. This plant is located about $1\frac{1}{4}$ miles from the main tracks of the Pere Marquette and Lake Shore railroads. This location of the plant was necessary, because the gypsum deposit on which it was to operate was discovered here. At the time the plant was completed, desiring railway shipping facilities, the Acme Cement Plaster Company made application to the Pere Marquette and Lake Shore railroad companies for tracks to its plant. The railroads declined to build the track applied for at their own expense. The Acme Cement Plaster Company at the time was without funds with which to do it.

"In March, 1905, Samuel Lazarus, a large stockholder in the Acme Cement Plaster Company, and now its president, acquired the right of way for a track from the main line of the Pere Marquette and the Lake Shore railroads to the west line of the property of the Acme Cement Plaster Company. Subsequently thereto, and during the years 1906 and 1907, other right of way was purchased from the Acme Cement Plaster Company and from other parties, which furnished in all a right of way from the Lake Shore and Pere Marquette railroads to the Acme plant, and extending beyond said plant a distance of $2\frac{1}{2}$ miles. The title thereto was taken in the name of Samuel Walker, the then vice president of the Acme Cement Plaster Company. Mr. Lazarus furnished the money to buy the right of way, and Walker, in taking the title, was acting as trustee for Mr. Lazarus. In the summer of 1905 Mr. Lazarus employed the Lake Shore Railroad Company to build the track from its main

line to the plant of the Acme Cement Plaster Company, except the part where it touched the Pere Marquette Railroad Company property, for which construction he paid the Lake Shore Railroad Company the sum of approximately $11,000. The tracks were not laid on the balance of the right of way acquired during the years 1905 to 1907, due to lack of funds and to the fact that no other industries had located along the right of way.

"The immediate object in the mind of Mr. Lazarus in procuring this right of way and causing the track to be constructed was to connect the Acme Cement Plaster Company's plant with the aforesaid railroads. His ultimate object, as he testifies, was the organization and construction of a belt line railroad encircling the city, sufficient to connect with the Pere Marquette and Lake Shore, and finally with the other lines of transportation entering Grand Rapids. Surveys were made of the proposed route, and nearly all of the right of way purchased, together with about 320 acres of lands for factory sites; all purchased with funds furnished by Mr. Lazarus. All conveyances were taken in the name of Samuel Walker, who took title as trustee for Mr. Lazarus. Up to the present time the only track laid is that leading from the Pere Marquette and Lake Shore railroads to the plant of the Acme Cement Plaster Company, and the Acme Cement Plaster Company is the only concern now served thereby; no other plant having been located on these tracks. The original plan has not been abandoned. The plaintiff company is endeavoring to secure other industries to locate on its right of way, and is offering free industrial sites. No track has, however, been built since 1905, and no industries, except the Acme Cement Plaster Company, have located on the track that was built.

"In December, 1905, at the instance of Samuel Lazarus and others, the Grand Rapids Terminal Belt Railway Company was organized, and later the right of way and track, held by Mr. Walker as trustee, was conveyed to it. The plaintiff now has title to the right of way and track which serves the Acme Cement Plaster Company, except that portion of it on land owned by the Plaster Company adjacent to the ware-

house, and as to that the plaintiff is possessed of an easement in the right of way and owns the rails. This track has been kept in repair at the expense of the plaintiff company since it was acquired. The funds therefor were borrowed from Mr. Lazarus, and the amount so expended has reached the sum of $5,300. The receivers of the Pere Marquette Railroad Company made repairs to the tracks of the plaintiff at different times, and on October 25, 1915, sued the plaintiff and the Acme Cement Plaster Company for such repairs. The receivers' bill for such repairs was $274.51, and before the case came to trial this amount was paid by the plaintiff company and the case dismissed.

"The plaintiff company maintains no office in this State, other than the office of Edward H. Christ, in the city of Grand Rapids, president of the plaintiff company, and employed by the plaintiff company to look after its interests. Mr. Christ draws from the plaintiff a salary of $25 a month. He formerly held the title of chief engineer of the plaintiff company, at a salary of $100 a year, and his principal duties have been to look after the necessary repairs to said tracks, and to check up the details of the repair bills rendered by the railroads for keeping this track in shape and to endeavor to sell factory sites along the track. He is a civil engineer, and maintains in Grand Rapids an office for the general practice of that profession. Plaintiff company's affairs are handled from St. Louis, Mo. Its only means of information relative to the use of the track by the Pere Marquette and Lake Shore Railroads is the bills of lading made out by the Acme Cement Plaster Company.

"The plaintiff has no rolling stock, maintains no stations, carries no passengers, receives no freight, and dispatches none—originates no traffic of any kind. It is in no sense a common carrier and has not pretended and does not now pretend to be such. Since the track was put in, in 1905, the Pere Marquette Railroad has used it in going in and placing empty cars for the Acme Cement Plaster Company and in taking them out when loaded, at the instance of the Acme Cement Plaster Company. No express agreement was ever entered into or any understanding had

between the plaintiff and the Pere Marquette Railroad Company, or the receivers thereof, regarding the use of the said track or pay for the same.

"Since July, 1905, the Pere Marquette Railroad has taken 2,876 cars of freight over the track in question from and for the Acme Cement Plaster Company. Of that number, 1,600 were taken out before the railroad was placed in the hands of the receivers, and 1,323 were removed more than six years prior to the commencement of this suit. From the record it appears that the plaintiff company, on the 31st day of December, 1907, sent a statement to the Pere Marquette Railroad Company, asking pay for the use of said track. This demand was refused by letter of March 7, 1908, in which the following paragraph appears: 'We are unable to locate any agreement between this company and the Grand Rapids Terminal Belt Railroad Company, covering the use of tracks and switching service at Grand Rapids. I wish you would give reference to date of contract covering the switching, or, if same is covered by tariff, authority specifying number covering it.'

"On the 25th day of March, 1908, the defendant wrote a letter to the plaintiff company, in which the following paragraph appears:

"'When you have complied with my request, 'and show authority for this trackage, I will be pleased to render voucher in your favor at our earliest convenience.'

"Nothing further was said or done by the plaintiff until October 6, 1909, when it sent a second written notice and itemized statement of its claimed account. To this communication the defendant, on the 18th day of October, 1909, replied as follows:

"'I do not see how we can recognize any such bill in absence of a filed tariff. The Belt Railroad performs no service whatever for originating the traffic, and under all the existing conditions we would have to decline payment, if bill is presented.'

"In 1910 or 1911, Mr. Lazarus had the matter up with Mr. Cotter, president of the Pere Marquette, in a personal interview, but Mr. Cotter simply referred him to some one else, and so nothing came of it.

"All of the corporate stock of the Grand Rapids

198—Mich.—19.

Terminal Belt Railway Company, except sufficient shares to qualify the required number of directors, is held in the name of Samuel Lazarus. He was likewise president of the company up to 1916. He is also president of the Acme Cement Plaster Company, and he and his immediate family own $425,000 of the $1,000,000 capital stock of that company. C. H. Sommer, secretary of the plaintiff company, is an officer of the Acme Cement Plaster Company, and owns one share of stock in said Acme Cement Plaster Company.

"The Acme Cement Plaster Company itself owns none of the stock in the plaintiff company, and has not paid any of its bills, or loaned it any money to construct the road or repair the track. Neither does the Acme Cement Plaster Company exercise any control over the plaintiff company, and no part of the sum claimed for trackage, if recovered, would be turned over to the Acme Cement Plaster Company.

"The Acme Cement Plaster Company does not own the lands adjoining the right of way of the plaintiff company on which tracks are located, other than those lands adjoining that part of the tracks located on the Acme Cement Plaster Company's property. Two hundred acres of land adjoining plaintiff's tracks are owned by the plaintiff company.

"The plaintiff demands from the defendant in this suit and from the receivers in the other suit $1 a car for every car that has been moved by the defendant to and from the plant of the Acme Cement Plaster Company. This, in my judgment, would be a reasonable charge therefor. The total claim against the Pere Marquette Railroad Company for trackage service, not barred by the statute of limitations, is $277, and the total against the receivers of the Pere Marquette Railroad Company is $1,276.

"The total number of cars moved by the Pere Marquette Railroad Company after the notice that payment would be demanded, dated December 31, 1907, is 759 cars, and the total number of cars moved by the receivers after this notice is 1,276 cars. Of the 759 cars moved by the Pere Marquette Railroad Company, all but 277 are barred by the statute of limitations. No demand for payment of any of these charges was ever made upon the receivers of the Pere Mar-

quette Railroad Company until the demand which immediately preceded the bringing of these suits.

## "Conclusions of Law.

"I. Under the testimony in this case, the track in question is a plant facility of the Acme Cement Plaster Company, within the reasoning of the following cases: *In the Matter of Transportation of Salt from Hutchinson, Kansas,* 10 Interst. Com. Com'n, 1; *Crane Iron Works* v. *United States,* 209 Fed. 238; *Delray Connection Railroad* v. *Railroads,* vol. 3, No. 2, Orders and Opinions of Mich. Railroad Com. page 80. *In re Chesapeake & Curtis Bay Railroad Company,* Public Utilities Reports 1915F, page 346.

"II. Being a plant facility, any division of the through freight charges, by whatever name it might be called—trackage services or switching charges—would be, in effect, a rebate, and in contravention of the law.

"III. Under the facts found in this case, there can be no recovery based upon an implied contract. Our own court of last resort has so often applied the well-settled doctrine in relation to implied contracts that it is fruitless to go outside of the State for authority. Judge STONE, in the case of *McCain* v. *Smith,* 172 Mich. at page 10 (137 N. W. at page 620), sums up the doctrine as follows:

"'It is a familiar doctrine that neither an express contract, nor one by implication, can come into existence, unless the parties sustain contract relations; that, to constitute either the one or the other, the parties must occupy towards each other a contract status, mutuality of will and interaction of parties, generally expressed, though not very clearly, by the term "privity." Without this a contract by implication is quite impossible.'

"In the old case of *Woods* v. *Ayres,* 39 Mich. 345 (33 Am. Rep. 396), it was held that the 'privity' essential to a contract must proceed from the will of the parties. It is inconceivable that there could be any privity or mutuality of will between the parties to this suit, at least after the claim first sent, in December, 1907, had been refused on the ground that no contractual relations existed. Surely the law will

not imply such privity or mutuality of will, and use it as a basis of recovery for that portion of the claim, at least, which accrued subsequent to the express declaration of the defendant that no such privity or mutuality exists. Pursuing the question from the angle that the claimed services were performed by the plaintiff with the expectation, at the time such services were performed, that they would be paid for by the defendant and that the defendant was charged with notice thereof, we are again confronted by the very basic principle of contracts—mutuality of will, meeting of minds, privity. It will hardly be claimed, much less argued, that whatever services were performed, after the express declaration of the defendant repudiating any contractual relations between it and the plaintiff, were performed by the plaintiff under the implication of a promise on the part of the defendant to pay what it had already expressly refused to pay.

"IV. As I view it, the claim of the plaintiff is not what the law would consider a 'running account.' That being the case, all items charged prior to six years before the commencement of this suit would be barred by the statute of limitations.

"V. In my view of the law, as applied to the facts in these cases, judgment should be entered for the defendant in both; and it is so ordered."

Plaintiff, appellant, filed exceptions to each of the four conclusions of law. From the findings of fact, to which no exception is taken, it appears that early in 1905, upon the completion of the Acme Cement Plaster Company, application was made by said company to the Pere Marquette and Lake Shore Railroads for tracks to its plant. This application was refused by both roads, and, as access to railway transportation was absolutely necessary to the life of the plaster company, Mr. Lazarus, its largest and probably controlling, though not majority, stockholder, undertook to provide the necessary track. He acquired the right of way and paid for the building of the road. Late in the year 1905, he organized a corporation (the plaintiff), which became the owner of all his rights, and of which he was

the sole stockholder, except as to qualifying shares. Over the track so constructed the defendant operated in delivering cars to and receiving cars from the plaster company. This practice continued for something over two years, until December, 1907, when a demand was made upon the defendant for pay for the use of this trackage. Payment was refused, and a second application was made in October, 1909, which was again refused. Thereafter, in 1910 and 1911, some further negotiation was had between Mr. Lazarus and the then president of the defendant company; but it is not claimed by the plaintiff that the defendant at any time ever agreed to compensate plaintiff for the use of the tracks, and it affirmatively appears that at least on two occasions it refused so to do.

Under the undisputed facts in the case, we find it unnecessary to discuss conclusions of law numbered 1 and 2; preferring to base our decision in the case upon conclusion 3. It is settled law in this State that railroad companies are not required to build or maintain tracks to private industries, nor to furnish the right of way or rails by which the traffic of a private industry reaches their lines. *Grand Rapids, etc., R. Co.* v. *Michigan Railroad Commission*, 183 Mich. 383 (150 N. W. 154) ; 1 Wyman on Public Service Corporations (Ed. of 1911), §§ 820, 821. It is not claimed by the plaintiff that any express contract exists between it and the defendant to pay for the use of the tracks connecting the defendant railway with the plaster company's plant. It seems to us clear that no contract to make such payment can be implied under the conceded facts in this case. Each demand for payment made by the plaintiff upon the defendant was met by a refusal, or by conduct which amounted to a refusal. Under such a state of facts, the law can never imply a promise to do that which in express terms has been refused. *Franck* v. *McGilvray*, 144

Mich. 318 (107 N. W. 886). See, also, *McCain* v. *Smith*, 172 Mich. 1 (137 N. W. 617). The fact that the service rendered, for which suit was brought (*i. e.*, the use of the connecting track), is of incidental benefit to defendant, is not controlling. It was primarily built for the benefit of the plaster company, whose duty it was, under the law, to furnish its own connection with the tracks of the defendant company.

The plaintiff at the present time is in no sense a common carrier, nor is its demand predicated upon the assumption that it is such; it not having filed any tariff with the railroad commission. The claim is based upon the fact that the plaintiff is the owner of the facility created by it for the benefit of the plaster company, whose principal stockholder is the sole owner of the plaintiff, and whose duty it was to itself construct the facility. The use of such a facility by the railroad company for the furtherance of the plaster company's business, with the consent of the plaintiff, in the absence of any express contract, or of conduct on the part of the defendant from which privity or a will to contract might be implied, imposes no obligation upon the defendant.

The judgment is affirmed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, STEERE, and FELLOWS, JJ., concurred.